Filed 11/19/13 In re J.M. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION 3

| | |
|---|---|
| In re J.M., a Person Coming Under the Juvenile Court Law. | |
| Contra Costa County Children & Family Services Bureau, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> D.M., <br><br> Defendant and Appellant. | A137489 <br><br> (Contra Costa County Super. Ct. No. J1100742) |

D.M. (Father) appeals from an order terminating his parental rights to his daughter, J.M., pursuant to Welfare and Institutions Code section 366.26.[1] His arguments challenge the juvenile court's findings of detriment to J.M.'s well-being made at earlier status review hearings, and are therefore not subject to review on appeal from the section 366.26 order. In any event, the orders Father challenges are constitutionally sound and supported by substantial evidence. We affirm.

**BACKGROUND**

J.M. was born in May 2011 and detained by the Contra Costa County Children and Family Services Bureau (Family Services, or the Bureau) based on information that both parents were homeless, J.M.'s mother (Mother) suffered from chronic and severe

---

[1] Further statutory references are to the Welfare and Institutions Code.

1

mental illness, and the parents lacked the means, judgment, and parenting skills to safely care for an infant. [2] At the time of J.M.'s birth, Father was in violation of probation related to his conviction for second degree robbery with a firearm and was arrested. The juvenile court found there were no reasonable means to protect J.M.'s emotional or physical health without removing her from her parents' custody, and ordered her detained. On June 8, the court sustained a jurisdictional allegation that J.M. was at substantial risk in Mother's care "in that the mother has a diagnosed psychiatric condition that prevents [her] from providing adequate care for the child."

The disposition hearing was held on September 9. Father had an arrest history dating from 1987 and convictions for armed robbery with a firearm and malicious mischief vandalism. He anticipated being released from jail on January 1, 2012. Prior to his incarceration Father had been staying with a relative and in a shelter, where he met Mother.

Family Services's disposition report questioned Father's ability to safely care for J.M. because his judgment was in question, he was "fleeing from the law on an outstanding warrant," and he did not understand Mother's psychiatric condition and how it trammeled her ability to care for the baby. The case worker reported that both parents "will need to make considerable strides in being able to appropriately attend to their own daily needs, address mental illness, substance abuse and the propensity for breaking the law, before they will be in a position to try to meet the needs of their child. Whether or not this will be accomplished will depend on their continued commitment and follow through with the elements of their respective case plans."

The Bureau recommended reunification services for both parents. Father's case plan included supervised visits, participation in an anger management program, counseling, and education in parental skills. He was also required to stay sober and drug-free, comply with all required drug tests, demonstrate an understanding of age-

---

[2] Because this appeal concerns only Father's parental rights, we will omit discussion of facts that are relevant only to Mother.

appropriate behavior for J.M., obtain and maintain stable housing, and keep the case worker apprised of his address and phone number.

Father attended the dispositional hearing with counsel and submitted on the disposition report. The court adopted the Bureau's recommendations and found by clear and convincing evidence that "there is a substantial danger to the physical health, safety, protection or physical or emotional well-being of the child or would be if the child were returned home and that there are no reasonable means by which the child's physical health can be protected without removing the child from mother's and father's physical custody." The court also found by clear and convincing evidence that placing J.M. with her father would be detrimental to her safety, protection, or physical or emotional well-being.

The six-month status review hearing originally scheduled for February 24, 2012 was continued to April 18 for a contested hearing. Father had been released on probation in early January. The Bureau's report for the February 24 hearing recommended that the court terminate reunification services, find visitation was detrimental to J.M. and terminate it, and set a section 366.26 hearing. Father had missed a scheduled visit on January 31, drug tests on January 26 and January 31, and a parenting class on January 31. He had also failed to provide the Bureau documents verifying his participation in services and the conditions of his probation.

Visitation was going poorly. J.M. cried throughout the one visit Father attended despite his attempts to engage with and soothe her. He told J.M.'s foster mother he had no questions about J.M. "as he knows everything about her already and that he has three other children." J.M. also displayed substantial distress during visits with Mother, although she was otherwise thriving in her foster home, developing appropriately, and appeared to be a happy and socially well-adjusted baby.

The Bureau's addendum report for the April 18 hearing said Father reported he was actively participating in all recommended services, including parental skills classes, anger management, and individual therapy. But by then he had missed eight random drug tests and a February 29 visit with J.M. was cancelled because Father was 90 minutes

3

late.  He attended three visits in March and April, but J.M. cried and was in constant distress throughout each visit.  Father "is unable to soothe [J.M.] and she remains unresponsive to his attempts to soothe her.  [J.M.] uses her hands to make a fist and physically pushes her father away.  Her cries are earsplitting and sound like she is in distress.  A number of staff at the Ellinwood CFS office have interrupted the visits to inquire if they could assist in anyway [sic]."  On a visit in March, a Family Services supervisor whose office was next to the visitation room called to report that J.M. was " 'crying excessively and . . . hysterical.  These visits are causing more harm to this child.' "

At the time, Mother was being treated for schizoaffective disorder, bipolar disorder, post traumatic stress disorder and chronic amphetamine use.  But Father repeatedly denied she had any mental health issues.  His plan was that Mother would care for J.M. while he worked full-time to support them.

After a period of transition, on April 15  J.M. was placed with a fost/adopt mother and was continuing to thrive.  Family Services continued to recommend termination of visitation and reunification services and that a section 366.26 hearing be set.

The contested six-month review was held on April 18 and 19.  Father's weekly parenting class instructor testified he had missed only one class since he started on January 24, participated actively in the classes, and "has learned some.  He still has a ways to go, but he has stated that he's learned and is applying the knowledge from the class."  Nonetheless, the instructor was concerned that Father lacked the cognitive ability to learn from the information provided in the classes.  She opined that Father was not ready to parent a one-year-old and would not acquire sufficient parenting skills to do so within three months.

When the hearing resumed the next day, the parties informed the court they had reached a resolution in regard to Father.  Family Services agreed to continue providing him with reunification services until the twelve-month review and to investigate training in parental skills that included hands-on parent-child interaction.  Father acknowledged that Family Services had provided reasonable services during the preceding period.

4

The court cautioned Father to comply with drug testing, stop lying to the social worker, and improve his interaction with J.M. Mother's reunification services and visitation were terminated and the court set a twelve-month review date for Father for June 6, 2012. Father's attorney approved and signed off on the Order After Hearing, which included findings by clear and convincing evidence that returning J.M. to her parents' custody would create a substantial risk of detriment to her safety, protection or physical or emotional well-being, and that Father had made minimal progress toward alleviating the causes for J.M.'s placement.

The Bureau filed reports for the twelve-month review on June 5 and July 11. It again recommended that Father's services and visitation be terminated and a section 366.26 be hearing set. Father had missed one therapeutic assessment with J.M. in May, without explanation, but had attended seven others. During these sessions J.M. was hypervigilant with Father and would cry, whimper, and try to avoid contact with him. Father tested positive for marijuana four times and negative for illegal substances and alcohol once since the last hearing. He had not responded to Family Services since May 22 and told his parenting teacher that he was no longer communicating with his case worker. The Bureau concluded that "[b]ased on [Father's] lack of progress, unwillingness to cooperate with the Bureau, positive drug tests, inability to form and/or maintain a relationship, inability to comfort and soothe [J.M.], inability to recognize, understand, and meet [J.M.'s] needs, and his continued inconsistent participation in visits the Bureau cannot state that [J.M.] would be safe in his care or that there is a substantial probability of return if services were continued." On June 6, the court declined to suspend visitation but ordered Father to drug test prior to each visit and warned him that a positive test would result in a cancelled visit.

The contested hearing was held on July 11. Father had tested negative for illegal substances since May 29, but had not enrolled in residential substance abuse treatment. He denied having any issues with drugs and demonstrated no insight into the effect of his drug use on his ability to take care of J.M. He had no source of income and had been evasive with the Bureau about his address and living situation. On June 14, after

discovering that Father's phone was disconnected, Father's case worker learned through a paternal aunt that he was living with Mother.

J.M. continued to demonstrate extreme distress during her weekly visits with Father. On July 7, the therapist reported that "it does not appear that [J.M.'s] hypervigilance around [Father] has decreased even though they have been together once a week for three weeks in a row. I do not see an attachment bond between them, nor do I see an attachment bond emerging. If anything, [J.M.'s] rejection of [Father] was the same as in the initial session when I saw them together for the first time. It also appears that . . . [Father] does not retain instruction. Based on this observation, it does not appear he is teachable." Family Services continued to recommend that the court terminate visitation and reunification services and set a section 366.26 hearing.

At the hearing on July 11, Father submitted as an offer of proof a statement that he formerly smoked marijuana to treat a medical condition, but no longer did so; that he hoped to live as a family with Mother and J.M. in the future; and that he understood Mother has mental health issues and would not allow contact between her and J.M. if the court so ordered. The court accepted the offer of proof but did not find Father's statements about Mother to be credible. The court found no substantial likelihood J.M. would be returned to Father within six months. By clear and convincing evidence, the court concluded that returning J.M. to either parent's custody would create a substantial risk of detriment to her safety, protection, or physical or emotional well-being. The court terminated father's family reunification services and visitation, set a section 366.26 hearing for November 9, and advised Father orally and in writing of his right to seek writ review of the order.

On August 17, Father's attorney notified this court that he had found no arguable cause to file a writ petition. On November 9, the court found by clear and convincing evidence that J.M. was likely to be adopted and terminated both parents' parental rights. Father appealed.

6

The main thrust of Father's argument, as we understand it, is that the juvenile court violated due process by terminating his parental rights without making a finding that he was an unfit parent. On closer inspection, he seems to be arguing that the evidence was insufficient to establish his parental unfitness or, as the issue is framed in California, that placing J.M. in his custody would be detrimental to her. Neither assertion has merit.

## I. Father's Contentions Are Not Properly Before This Court

Whether framed as an issue of due process or sufficiency of the evidence, Father's arguments are aimed at the findings of detriment made at the six and twelve-month review hearings. As such, they are not properly before this court on appeal from the order terminating his parental rights. "Subdivision (*l*)(1) of section 366.26 provides that an order setting a section 366.26 hearing is not 'appealable at anytime unless' specified steps are timely taken to secure review by extraordinary writ. In order to obtain review on appeal from the final order in the section 366.26 hearing of issues subsumed within an order setting a section 366.26 hearing, a party must first timely file a writ petition seeking review of the order setting the section 366.26 hearing; the petition must substantively address the specific issues to be challenged; the petition must be supported by an adequate record; and finally, the petition must have been 'summarily denied or otherwise not decided on the merits.' (§ 366.26, subd. (*l*)(1)(C).)" (*Joyce G. v. Superior Court* (1995) 38 Cal.App.4th 1501, 1507.) These requirements are not met here because Father's attorney determined there were no viable grounds for a writ petition to challenge the order setting the section 366.26 hearing. Nor is the detriment finding made at the 6-month review subject to challenge through this appeal. " 'A challenge to the most recent order entered in a dependency matter may not challenge prior orders for which the statutory time for filing an appeal has passed.' " (*In re Jesse W.* (2001) 93 Cal.App.4th 349, 355.)

Courts will disregard a waiver if due process so requires (*In re Janee J.* (1999) 74 Cal.App.4th 198, 208; see also *In re Meranda P.* (1997) 56 Cal.App.4th 1143, 1155, fn.

5), but such a consideration arises only where the alleged error "fundamentally undermined the statutory scheme so that the parent would have been kept from availing himself or herself of the protections afforded by the scheme as a whole." (*In re Janee J., supra*, at p. 208.) Because of the significant safeguards built into this state's dependency statutes, "in the usual case, application of the waiver rule will not offend due process." (*Ibid.*) That is the case here. Father was offered reasonable reunification services and was represented by counsel at all relevant times. He was advised of his writ obligation, both orally by the trial court and in writing, when the court terminated his visitation and reunification services and set the section 366.26 hearing. Therefore, due process was satisfied and Father is not entitled to a waiver of the rule against untimely appellate review in dependency actions.

We therefore cannot review the "parental unfitness" findings.[3] However, to dispel any misunderstandings about what happened here, we nonetheless explain that Father's contentions would not have prevailed had they been raised in a timely fashion.

To the extent Father claims a due process violation, it is long settled that California's dependency system " 'comports with *Santosky's*[4] requirements because, by the time parental rights are terminated at a section 366.26 hearing, the juvenile court *must* have made prior findings that the parent was unfit. [Citation.] "The number and quality of the judicial findings that are necessary preconditions to termination convey very powerfully to the fact finder the subjective certainty about parental unfitness and detriment required before the court may even consider ending the relationship between natural parent and child." [Citation.] The linchpin to the constitutionality of the section

---

[3] D.M. correctly acknowledges that California's dependency scheme requires clear and convincing evidence that parental custody would be detrimental to the child, rather than proof of "parental unfitness" (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 224. fn.3), although the two terms are sometimes, unfortunately, used interchangeably. (See, *ibid* ["the term 'parental unfitness' suggests an all-or-nothing approach that does not take in the unique circumstances of each parent-child relationship"].) It is beyond dispute that the detriment finding is the functional equivalent of the former "parental unfitness" for purposes here. (*Ibid.*; see also *In re Cody W.* (1994) 31 Cal.App.4th 221, 224-225.)
[4] *Santosky v. Kramer* (1982) 455 U.S. 745.

8

366.26 hearing is that prior determinations ensure "the evidence of detriment is already so clear and convincing that more cannot be required without prejudice to the interests of the adoptable child, with which the state must align itself." ' " (*In re P.A.* (2007) 155 Cal.App.4th 1197, 1211.)

Here, the juvenile court's findings of detriment are supported by sufficient evidence. "We review the record in the light most favorable to the court's order to determine whether there is substantial evidence from which a reasonable trier of fact could find clear and convincing evidence that the children would suffer such detriment. [Citations.] Clear and convincing evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt." (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1426.) Without belaboring the evidence discussed in the background section of our opinion, there was ample evidence that Father planned for Mother to take care of J.M. despite her severe mental illness that rendered her incapable of doing so, and that he lied to Family Services about his plans. Despite repeated hands-on parenting instruction, Father appeared incapable of learning to properly interact with J.M. He also failed repeatedly to cooperate with the Bureau and keep it apprised of where and with whom he was living. Under these circumstances, the dangers inherent in entrusting J.M. to his custody are plain. Beyond these problems, which weighed heavily with the juvenile court, Father also had multiple missed or positive drug tests, failed to participate in a residential drug treatment program as advised by Family Services, and had no apparent prospect of obtaining a suitable and stable home for J.M. All of this, considered together with J.M.'s extreme and undiminishing distress during visits, supports the court's determination.

## DISPOSITION

The order terminating Father's parental rights is affirmed.

_____

Siggins, J.

We concur:


_____

McGuiness, P.J.


_____

Pollak, J.